The next and last case now on our calendar is BWP Media vs. Polyvore. Good morning. Good morning. My name is Kenneth Sanders and I represent the Plaintiffs' BWP Media and National Photo Group. May it please the Court. There are a wealth of issues before the Court through the parties' respective briefs. Pick your best one. I'm going to start with Aereo because that seems to be the threshold issue. If Aereo has the effect that the Plaintiffs believe it does, an effectively overruled cartoon network, then remand is necessary for us to go back and continue forward. I think we could probably perhaps save you a little time. Even if you're right, hasn't our Court said that if the Supreme Court says something that puts in doubt one of our decisions, it's up to them to give it a decent burial instead of asking us to do it? Well, your Honor is correct. The Court has noted that . . . If you're right that they have rejected our decision, and if we rely on it in this case, you will seek cert. And if you're right that we have relied on a decision they don't like, they will presumably grant cert and reverse us. Isn't that the track you're obliged to follow? Well, we might have a stop with an en banc hearing so the Court could . . . Well, okay. You could ask that, and they'll tell you the same thing. The question of whether or not Aereo did something is one I think . . . Just for a second. The Supreme Court never mentioned doing away with a voluntariness requirement. And, in fact, it was highlighted in the dissent by Scalia, and he makes that point. Subsequent cases elsewhere have kept the Cablevision voluntariness requirement in place. And Cablevision . . . I mean Aereo was decided on a performance prong. And that was a set of aerials that had been set up, 10,000 antennae that had been set up in order to try and capture existing TV shows and rebroadcast them over. Over the Internet. So, you know, they singled out that case and found it to be a performance without disturbing one . . . except only by possible implication, which goes to Judge Newman's point, the prior law. Right, Your Honor. We know that if the controlling precedent of Cartoon Network was unaffected in its entirety by Aereo, they'd still be in business. Because the facts are, and the facts are undisputed . . . They went bankrupt. I don't know. You know . . . Well, they filed for bankruptcy after the injunction, Your Honor. You're entitled to use your time any way you want. You're the lawyer for your client. But, you have limited time. We've tried to show you that the point you're making now can be pursued and must be pursued under our precedence by going to the Supreme Court. Now, you can take the rest of the time and tell us we're wrong about that. But, you have a lot of other issues that there's a copyright violation here, even under our existing law. And so, I hope before you're done, you're going to get to those points. That's correct, Your Honor. My second point is that even if the volitional . . . Secondary liability. What was that? Secondary liability is the point you're making. Well, there's another moment in time of direct infringement before we get to the secondary liabilities. That is, the copy that is made by the defendant in this case, not at the bequest of the user. And, as it relates to that, we're looking more at MP3 tunes, Gardner Press out of California. Are this the nine copies? This is the nine copies, Your Honor. Do you want to tell us how that is done? You know, what amazes me about this case is that neither brief tells us exactly what's happening. I appreciate everyone's caught up in the law, and that's understandable. But, the facts matter. And, if the facts are undisputed, it would be nice to have a precise layout of the facts. So, now you're talking about the nine copies. Just tell us, how are the nine copies made? Your Honor, the user, through the browser, literally selects with a square that which they want to clip. Those are already on their website? They would be viewing a picture on their own computer from some other website. That they found on the Internet somewhere? That they found somewhere. And they clipped? They would clip it, the same as we would clip necessarily from, you know, an old circular. They then put that, after they clip, they put it on Polyvore's website, correct? Well, their tool actually is the clipper. So, the Polyvore tool is the scissor itself. It is clipping the image and automatically uploading it. While you're running the Polyvore program, you find something that you want. You use the Polyvore clipper to clip the image. Right. Do you see that picture on their website, or do you find it out there in the Internet somewhere else? These would be images you found on the Internet somewhere else. And what do you do if you want that picture? You put a box around it with their program. On your computer. When you say their program. First, you find it out there on the Internet. Correct. On somebody else's website. Correct. You can't put a box around that, can you? You can, Your Honor. On somebody else's website? They provide the software tool that allows you to work from someone else's website. But if I just go to the Internet and see another picture I like and I'd like to copy it, I can't put a box on it, right? You could, but not that would upload to their system in the manner that they've created. You have to use the Polyvore clipper. Yes. To get it into their website, you have to use their tool. All right. So I first have to download or get access to their program. Just using their website gets you access to their program. All right. Now I wish to get the photograph from somebody else's website. I use part of their program and put a box around it. Correct. All right. And then where does the photograph go? See, now we have a much more complicated process because it doesn't just take a picture of what you put a box around. Their system records the actual computer instructions, the URL, for where that image was that you clipped. And it copies from that location the actual image, not what you selected, but the results of what you selected. This is a little complicated, I understand. Not what you selected, but the results of what you selected. What's the difference? When you look at a webpage on a computer, Your Honor, and you see a picture, there is actually a unique URL address for that picture. Are you talking about metadata now? Not yet. All right. We'll get there. So when you're looking at a webpage and you see a handful of pictures, each of those pictures has its own storage location. Yep. And the webpage is composed by putting those pictures from a database into the page itself and then displayed to you. The Polyvore system looks up and finds the URL of the picture that you just put a box around. Okay. So it preserves that information. It knows where you got the picture from. Right. It then copies the picture from that location because that's the best source of it. Copies it to where? Their system. When you say their system, on their hard drive somewhere? Yes. On a hard drive. On a hard drive, cloud storage is ultimately where it's going to end up. They put it on their website, don't they? They put it on their website. That's before the collage is made? Well before the collage is made. Once it's brought to their website, they then strip out all the copyright information, all the metadata, and they make nine copies. Right. They index them, and then they put them in their general library for everybody to use. The copies are not identical, I understand. They're different sizes. Different sizes. And that's because they want their system to be used by users who have different devices. Presumably it's to accommodate mobile. Some are iPads. Some are phones. They're different sizes. Computers. And so that's how that image can be used that way. And it's their program that makes the nine copies? Correct, Your Honor. The user hasn't said, I want nine copies. To our knowledge, there's not a single user that's aware nine copies are being made. Maybe it's embedded somewhere in some terms of service, but the user experience doesn't include that. Whether they're aware or not, they haven't asked for nine copies. I don't believe that would be an accurate statement. They have used the tool to copy a picture. They want to make a collage. The defendant is going to copy that picture that they've uploaded to other places for other purposes. That's not part of the user experience. They have no awareness of that. That's all I'm trying to get at. The user did not ask Polyvore to make nine copies. That's correct. All right. Polyvore's program made the nine copies. That is also correct. Because somebody at Polyvore created a program with the capability to do that. Absolutely correct, Your Honor. Is this an agreed upon fact or is it disputed? I do not believe that's a disputed fact that Polyvore is making nine copies. As part of our proffer in the district court, we provided the express URL addresses of each of the nine copies for each of our photographs. We also provided where the original photograph had been located and the difference between what was on their system and what was recorded as being the source location for the photograph. Apart from the nine copies, if their program only put on their website the one copy, would you have a direct infringement case? If the website put only one copy and left it alone, possibly not. When you say left it alone, are you now talking about stripping the metadata? Correct. Okay. All right. Let's take it in stages. If a user says, I want a certain photo that I found on the Internet and using the program of the defendant, I get it uploaded onto their website. If they just did that and made no nine copies and did no stripping of metadata, would you have a direct infringement case? We would have a direct infringement case for the storage, but it would be shielded by the DMCA. So they would have an affirmative defense to our direct infringement claim. Only under the Act? Only under the Act. All right. So it's the added features of stripping the metadata and or making the nine copies that takes you out of the Act  Correct, Your Honor. The user upload is the key to the Act. I'm sorry. I'm sorry, Your Honor. How does stripping the metadata affect the copyright infringement? It seems to me it's the same copy without the one copy but without metadata. So it's less than a copy. No, no, Your Honor. Stripping out the metadata is akin to removing the watermark, meaning if you were to take the watermark off a photo, we would understand that to be a copyright violation. This is the modern equivalent of the watermark. Nobody wants to see a watermark on a photo. The modern method is embedding the information as to the owner of that photo inside of the image itself. All the computers are accepting and recognizing it. It's accessible to everyone. By stripping that out, you've essentially removed the watermark. I think that's the print equivalent to what the conduct is. And to Your Honor's question, the user uploads a photo. We agree that that's at the bequest of the user. The copying, we say, is not. The stripping of the metadata is not. Those are separate and apart acts of direct infringement. So they wouldn't be shielded by the DMCA. They wouldn't be covered by the act because they're not at the request of a user. So we'd be back to the image being stored on their system without authorization, direct infringement, and we don't have a DMCA protection. Why isn't it at the request of the user, since it's the user who uses the clipper originally? The user starts the process, Your Honor, 100%. But there comes a time where the user's process ends and the defendant's conduct begins. And that second moment in time is the direct infringement by itself. It's an act of infringement. They are making their own copies, not at the bequest of the user anymore, but for their own purposes. And so that secondary copy that they make, nine of them, is an act of direct infringement, the storage of those images. And once those nine copies are there, who else has access to them? The world. The world. Okay. But under those circumstances, wouldn't the Safe Harbor defense kick in? No, the Safe Harbor would protect the original upload from the user to their website. The Safe Harbor would end once they start making their own copies, once they start eliminating the metadata, which would violate their entitlement to claim under the act. So that second set of copies is what we're focused on. The second set of copies is independent copying that is not subject to the Safe Harbor. Correct. Because those are no longer being requested by or done by the user. That's now their own conduct. Stripping the metadata makes it hard to know where this photo came from? Well, it releases out onto the Internet nine copies that lack the copyright information embedded by the author. But as to your Honor's point, they've given us the crosswalk. So if we stay on their system, they told us where the image started. So we're able to identify the characteristics of the image that was uploaded to their system, showing that it did, in fact, have its intact metadata at that moment in time. And then we're able to show the nine copies that they make where that metadata has been removed. And now those nine copies float around the Internet. Without any copyright information on it? Without any copyright information. You can't go back and find it again? Correct. Without the metadata? Right. Their website is unique in this regard. Most other websites don't record the source of the upload. So we can't crosswalk out the infringements we're still finding on the Internet, now without metadata, to their website and blame them for them. But that's a direct result of their conduct. All right, continue. So if we look at that moment in time where these additional copies are made, and we focus on that, we have a moment in time of direct infringement. We have the metadata issue, which would vitiate their entire entitlement to the DMCA protections under the Act. Well, that's because you're claiming that's a standard industry practice. I am claiming that, Your Honor, but it is a standard industry practice. Doesn't that require uniformity? And, first of all, aren't standard industry practices noted and determined in advance? They're not just subject to what you might come up with in litigation. Well, Your Honor, the statute either contemplated that the government would host a conference and invite in industry and conduct this in some formal mechanism, or that, like many things that happen, common characteristics and practice get developed by the industry itself and adopted by everyone. In this case, these pictures, this information, this metadata I'm referring to, you can read it and access it on every single computer, phone, tablet. It's in every camera. So to suggest that it's not standardized because we didn't hold a conference or have the government involved in the creation of it would be a mistake. It is, in fact, this de facto standard. Now, I am aware that the defendant has raised the issue in their briefs concerning that this is an act to protect the privacy of people who are unaware that this metadata exists. And when you take a picture with your camera or your smartphone, it does record a lot of information that you're not aware of, the latitude and longitude of where you were, who you are, where you were, the camera speeds, and a number of other things. What it doesn't populate, though, is the copyright field. That you've got to put in yourself. So when you say you're protecting the privacy of individuals by stripping out this metadata, you can get that pretty far, but you can't get it over the finish line because why are you taking out the copyright line? Don't you describe that as the watermark, the metadata? Correct. But if it doesn't include the copyright information, how are they comparable, the metadata and the watermark? Well, you see from some social media sites that they will, in fact, strip out the metadata, but they're not stripping out the copyright metadata. They're stripping out the other fields. There are a host of other pieces of information that are considered metadata. Do other sites leave the copyright data in when they take a photo? I'm not aware of another site that removes copyright data. Like I said, it's not normally populated by a camera. It's usually embedded by the author on purpose to protect their copyright. When you say, as you have been saying, the copyright data, what do you mean by that? When we refer to metadata, we're referring to a host of fields, data within data, metadata. So if we're talking about an e-mail message, it would be. . . The copyright data. There are specific fields, copyright management information, that are part of this metadata, one of which is the copyright owner. So when I refer to the copyright information, I'm referring to akin to marking this, I own this. This is mine. If you want to use this, come see me. The name of the owner. The name of the owner. Is there a CO, a C, a copyright symbol? It's actually, the field is copyright owner. So you're populating the field that is intended to contain copyright owner information. Other than the copyright owner, what else is in that phrase, the copyright, would you call it data? Other than the owner of the copyright, there's nothing else in that particular field. That's the only information that would be there. All right. Other than the other metadata, the URL and everything else, it's the name of the copyright owner. That is the key data point, yes, Your Honor. Counsel, you've spoken about direct infringement, and we've given you much more time. Do you want to take one moment to discuss the secondary liability claims, which were also decided against you? Yes, Your Honor. There were two claims, well, three claims, but two that we'd like to focus on beyond the direct infringement, that being the vicarious and contributory infringement. Go on. As it relates to vicarious, the test is well-established. It's the right and ability to control and the profit from. The direct profit from was what it seemed that the district court in this case struggled, because clearly Polyvore has the right to control that conduct that occurs on its website. This is where you get into a discussion when you have an Internet-based advertising model, and your revenue is directly related to your traffic. The more traffic you have, the more valuable your Internet property, the more you make in advertising. The use of celebrity photographs as a draw, as a mechanism to achieve traffic, is very commonplace. We see it all the time. That's why my clients have a business. They sell celebrity photos because people are interested in looking at them. In this case, what Polyvore has done is leveraged my client's work product to drive traffic to themselves, but they didn't pay for it. So they're profiting from my client's work efforts in creating these celebrity photographs. I know, but you still have to show certain elements to prove vicarious liability or contributory liability. We have to show that there was a profit from the activity. You have to show the right and ability to supervise or control. Correct. But this is a closed platform, Your Honor. Direct financial interest. Right. This is a closed platform. The only activities that occur on the Polyvore website are those that were authorized and created by Polyvore to occur. I mean, they have the expressibility to control this conduct. No. They could literally. If you leave out the metadata and leave out making the extra copies, the whole point of the cable vision case is that they do not, that all the copying is done by the user. And so then it's a question of how that copying is controlled by Polyvore after the user makes the decisions in question. And the argument the other side is making is that it's all automatic, that there is no control by Polyvore. No individual at Polyvore is stepping in at this point and stopping them from doing what they're doing or telling them what to do or not to do. It's all done by the user. So that's the control picture, it seems to me. Now, what's the financial? If we go back to Cartoon Network, the concept was human intervention. That's volitional conduct. The machine doesn't do anything on its own.  It's just a machine. It's the user that does everything. We know that ultimately an injunction was granted. So it's not as simple as it once was. We can now make a computer do anything, and you could program it to violate copyrights if that's how you so desire to program it. You could also program it to not violate copyrights. Well, if you program it to violate copyrights, then you're a direct infringer. Yeah. And that's not the issue here. The issue here is when you have copyrightable and non-copyrightable material, which can be copied then by the device at the user's instance, that's when the safe harbor comes in to determine and the various doctrines relating to contributory infringement come in to see whether or not there should be liability. And so that's a different story. Right. So we've argued that their creation of those nine copies was an intent to violate copyright and does violate copyright. But since the images do contain metadata, those that do, it would not be a particularly difficult program exercise to say, is this image copyrighted? Is there an owner listed in the copyright owner associated with this image? And if so, then do you have the owner's permission to upload it to our system? If you're going to write the program to do these complicated tasks, it's not an overly burdensome request to do so without violating my client's rights. So the right and ability to control is there. The increase in traffic is there from the usage of celebrity photos. The promotion of celebrity photos by the defendant to create contests, be the first to make a collage out of this, all designed to promote and drive traffic. More traffic, more sales, more advertising. Are you accepting as a premise that if the machine does the copying, there's no infringement? No, Your Honor. No. All right. It sounded for a minute like maybe you were. So I have one last question. I think it will be the last. You've brought many of these suits. Have you prevailed in any of them? We've prevailed well. If prevailing is successfully recovering for our clients, we've prevailed in an overwhelming number of them, Your Honor. We've had just a handful of losses to date. So you've had a handful of lawsuits and have you prevailed? No, no, a handful of losses to date. Oh, losses. Have you prevailed in any? On every other case, Your Honor. Of all the cases that we've brought, we've had a positive recovery for our client on other than just a couple. Are you talking about settlements or are you talking about trials? Both. Some have gone to trial. Most have settled. You know, the prevailing party fee is a strong deterrent to taking a case to trial. So the vast majority of these have settled. Thank you, counsel. Thank you. We'll hear from Polyvore. Now I know why we're last. May it please the Court, Orrin Snyder for the appellee. Judge Newman, the reason the record is bereft is because the plaintiff filed this lawsuit and did not prosecute the case, which the magistrate judge below and the district court both noted repeatedly and took no depositions. When you say didn't prosecute, they filed a motion for summary judgment. That's not exactly an abandonment of the law. They did so after informing the court below that they did not have a prima facie case, insisting that discovery be reopened. They declared to the court pursuant to Rule 11 that without discovery they would not have a prima facie case. They then dropped 75 percent of their claims. We then moved for summary. What document dropped 75 percent of their claims? In the summary judgment motion. And now they're prosecuting those on appeal. In theirs or in their opposition? In both. In both. And now they've resuscitated them all on appeal. Your Honor, the other question is. Let's get to this waiver. You're saying they affirmatively dropped 75 percent of their claims. They did not. Yes, they did not argue in favor of those. They only argued. When they make a summary judgment motion, they don't have to make a motion that they're entitled to summary judgment on every claim. I'll wait for you to come back. Yes, Your Honor. My colleague is just giving me the record. If somebody has a lawsuit and has three claims, and they think they're entitled to summary judgment on one of them, so they make that motion. Do you think that's an abandonment of the other two claims? I wasn't saying abandonment as in waiver, Your Honor. What I'm suggesting. Well, what kind of an abandonment are you talking about? What I'm suggesting is the plaintiff below asserted that they did not have a prima facie case, and then they did not argue. What document did they say that? Let me get that cite. Let me get that cite. That is at. This is arguing for discovery and extension. Yes. Yes, yes. Yes, that's at. Yes, that was docket 65, quoting the docket 65 at 7. Let me address some of the substantive points. You're giving the document number? The ECF number. Yes, it's on the docket at. Is that in the joint appendix? Is that in the joint appendix? The docket is not, but the letter citing it is. I'll get you that in a moment. There's a document that you say they gave up most of their case, but it's not even in our joint appendix? It's in a letter, Your Honor, that cites to the docket, yes. It's in a letter. Is the letter in the joint appendix? Yes, Your Honor. What's the page reference to the joint appendix? J.A. 173, 173. Just a minute. J.A. 173, 177 is a letter which cites to the docket. And I gave the court the docket, so incorrect as well. Provide the underlying document to the court. But it's the underlying document? Yes, Your Honor. That you say is an abandonment? We have not argued abandonment, Your Honor, as a matter of law. I'm simply expressing that in response to your question, the reason the record is not fully developed is simply because this plaintiff here, as in many courts, filed a lawsuit, did not take any depositions, and did not adduce a record. That was the simple point. So as I understand it, there was a motion for an extension of discovery by the plaintiff, and the plaintiff and the judge was reluctant to do that, and the judge says, well, if you don't do that, I will not be able to establish a prima facie case. They told the magistrate judge that . . . The magistrate judge. Yes, they told the failure left them unable to establish their prima facie case. But that's different from, therefore, we give up those cases. Of course. I was just explaining to Your Honor, I'm sorry for the confusion, why the record is sparse. That's all. That was the only purpose. I was just explaining. You misunderstood my first question. I didn't say a word about the record being sparse. I said the briefs were sparse. The parties coming to this court on an appeal, neither side, as far as I could see, told us exactly what's going on, and you both know it. And the reason, Your Honor, is we believe that the plaintiff had a complete failure of proof, and it's their burden on summary judgment. When you say a failure of proof, of course there hasn't been a trial. We're not at Rule 50. We've got a complaint. They say their complaint makes certain allegations that show infringement. Now, either they're right or they're wrong. But the fact that there isn't a trial record doesn't tell us whether their allegations entitle them to relief. I meant the summary judgment record. If I could address the merits. Slow down. So there was a motion for summary judgment you raised, and you're saying they didn't oppose it. They couldn't oppose it on facts. There was no disputed facts because they never took discovery. That's correct. And on the undisputed record, we think this is a very clear case and a very easy case. That gets to my question about the nine pictures. Yes. What's the record on the nine pictures? The record is counsel's affidavit. Saying that it makes nine pictures. Saying that it makes nine copies. And we argued below that that was his say-so, his testimony. That's it? No. And there's no record, nothing in the record on the basis of their discovery to indicate that. Correct. Does it make nine copies? It makes multiple copies for sizing differences automatically in order to accommodate different. Well, that's the purpose. All right. Before you get to the purpose, does it make nine copies? There's nothing in the record to that effect. My understanding is that it makes. You know your client. Are you standing there telling us you don't know if it makes nine copies? I know that it makes multiple copies, Your Honor. And I will assume. Is the number pretty close to nine? I will assume for the purpose of this argument that it's nine. I'm not being coy. I'm really not, Your Honor. But I don't think it matters whether it's nine, four, or 15 because it is done. It's multiple. It's multiple copies made through an automatic. It's not a mistake. It's not as if all of a sudden it made one extra. It's not that. No, Your Honor. It made multiple copies. Why is that not an infringement? Because it is no different than the making of one or four copies. It is an automated response to a user's decision to infringe. What difference does it make that it's automated? Well, the case law is clear. This Court's decision in Cartoon Network, the Fifth Circuit's decision in – Cartoon Network was a video recording device, right? But in order to find direct infringement, you have to find volitional conduct. And the question of volitional conduct is – No, but if the computer system starts making copies, extra copies, in different ways, then it seems to me beyond what the user authorized that you might have a problem. We don't believe that the number of copies made is the dispositive question. We believe the dispositive question is, did Polyvore or the user upload the infringing item? And all Polyvore did is provide an automated service, and it set up the service, it operated the service, a service that's necessary for the functioning of the Internet, which is to make copies of uploaded materials to accommodate the user's interests. But the user didn't ask for the extra copies. Well, if I'm uploading a wedding dress photo or something in the public domain, if I'm following the terms of service and not uploading copyrighted material, I may want more than one copy to accommodate – You're talking about copyrighted material. Right. And the case law says that when you do nothing except in response to a user's command, meaning to say there is no – But you are doing something – you're doing something beyond the user's command. The user wants a copy. You're making eight other copies or nine other copies to suit the business model and purpose, the business planning of your client, because you want these copies to be available on various devices, all to the benefit of the client. Now, that's a little different than making a copy at the request of the user. We respectfully disagree, and we also believe that a ruling that makes a distinction between uploading one copy and multiple copies would be dangerous to the free expression on the Internet. The reason for the volitional conduct rule is clear. It's to say that we need, in terms of authorship of infringement, who is the responsible party.  We don't provide the user with access to that content. The case law for direct infringement, where defendants are held liable for direct infringement, they are actively participating in the procurement, the fetching or the theft of the material from some other source. What makes this case a dangerous case for application of direct infringement is we are truly a passive host. We did not provide the user with the copyrighted images. We didn't provide them with the means or access to get them. To the contrary, we instruct our users in their terms of service to not violate copyrights. All we did is set up a service. We operated a system that says if you put one of your photos, let's say of your wedding dress up there, we're going to accommodate you by giving you multiple copies so you can cut and paste them on different platforms. Multiple copies are for the user? Of course. Not for Polyvore itself? For the user to be able to access the video, the images, on different platforms. And then the world has access to them. But that's no different than the BWP case. And to answer your question in terms of Aereo, Mr. Sanders made the same arguments to the Fifth Circuit that he made here. Each one of the arguments, the Fifth Circuit squarely rejected those arguments, and that is now on appeal. He sought cert in the Supreme Court from the Fifth Circuit's affirmance of the dismissal. And in that case, BWP, it's exactly like this case except the multiple copies. The user uploaded photos onto the defendant's website. It was a public forum called Hairtalk. The defendant hosts a forum on which infringing content was posted, but its connection to the infringement ended there, same as here. So it's the same except for the big difference? With respect, Your Honor, I do not believe that's a big difference because the sizing differences are automatically made in response to the authorship of infringement. In other words, Your Honor, I think the— Let's deal with automatic. It's your position that if a machine does the copying, then there's no liability on the person who invented the machine. Is that it? Unless the machine owner, whether it's the copymaker, whether it is the BWP and TNS Hairtalk, or whether it's the Perfect Ten case where the Ninth Circuit rejected the same argument made here, held that a user-driven platform, when a user uploads content on the defendant's server and then it's shared on bulletin boards on the Internet, the technology involved, the machine, is not the infringer. It's a piece of software. It's a passive host that is responding to commands— Which case are you referring to there? That's the Perfect Ten case from the Ninth Circuit. And as Judge Scalia noted in his dissent, every single circuit to address this question has looked, Your Honor, at who is responsible for obtaining the infringing material and then providing it to the Internet. And where the machine maker, in this case, Polyvore, or in the BWP Fifth Circuit case, TNS, or the Tenth Circuit case, Perfect Ten, and all the circuit courts that have came to the same conclusion pre-ARIO, when the machine does nothing, then, give lifeless software that responds to a command of a user, and that is the start and end, the copying of the uploaded material. There is no direct liability. And there's a sound policy reason. Judge Scalia notes it. All of the courts, the Fifth Circuit in the BWP case that Mr. Sanders argued, noted it. And the Supreme Court last term said, the most important place for the exchange of views is the vast democratic forums of the Internet in general and social media in particular. And the danger here— But, Your Honor, that's people who decide to put their images on the Internet. But the danger here— They don't need you for that. The danger here, Your Honor— When they're talking about what a great, wonderful thing the Internet is, they're talking about people go around with their smartphones, they take pictures, they upload them to the cloud, they do that. Right. But, Your Honor, the danger here, Judge Walker, Your Honor, in the Cablevision case, you wrote, issuing a command to a system which automatically obeys commands and engages in volitional conduct cannot be a basis for direct liability of the passive host. So the question— What was the device there? A video recording device, right? Correct. It was sort of one step beyond Sony Betamax. It was a remote device. Right, but the BW— It was a remote recording device. But every circuit— And you think that means that any piece of equipment running any piece of software gets— No, I don't, Your Honor. I think that the relevant inquiry under every circuit decision to address this— not a single circuit court has adopted this argument. Every circuit to address this, including two circuits after Ariel, has squarely held the inquiry is, who posted, obtained, procured the infringing content? And when it is a user who makes that infringing decision, that authorship, the question I think Grokster asks is, who authored the infringement? The authorship of the infringement here is the user. We discourage infringement. In fact, infringement is a violation of our terms of service. We do nothing except in response to the user's command, and then we make copies. But that is exactly what all of the defendants do in all of the cases where they prevailed in response to this argument. So I wouldn't make the argument as sweeping. The record has to be searched for evidence of volitional conduct. And Judge Scalia notes in his decision that every circuit court that has ever found direct infringement finds in the record affirmative acts beyond responding to user choice to find liability. Affirmative acts by personnel of the provider. Correct. So, for example, in a case where—in the MP3 case, this court found that the direct act of infringement was MP3, when a user uploaded a song, searching the Internet for copyrighted cover art of records and then marrying that cover art with the music. And, of course, that's a— But the program there was designed to infringe. That's a theft. They had a program designed to steal cover art. There's nothing in our program inherent to it, systemic to it, in its design, in its implementation, certainly in its intent, that encourages infringement. And the inquiry under the volitional conduct test is causation. And it is a proximate cause analysis. That's what all the cases say. And when you have software code or other functionality that simply responds to a user's command, a theft's command, a thief's command, a thief says, I want to put material on your website, and all we are doing is, through an automated system, responding to that command, the case law is clear that that user-posted infringement cannot impose liability on the machine maker, and that's where the danger does come. It doesn't depend what kind of a machine. I follow you with a video recorder. I follow you, as our court did, with a remote video recorder. Does that mean that no matter what the machine is, no matter how sophisticated the program is, so long as nobody talks to a person and says, does it, it's just the machine? I don't think the test is, it's just a machine. I think the test is. Well, I thought that's what you're saying. No, Your Honor. I'm saying you look at the record evidence, and is there any evidence that the machine maker took any affirmative steps to procure, to procure, select, upload the infringing material? And when the machine maker does that, the machine maker is liable. But here. MP3 was a machine. MP3 was a machine. It was a machine, but it was directed at copyright infringement. Its whole business model was copyright infringement. And in this case, Your Honor, it's not machines have immunity. You have to look at what the machine maker, in this case, Polyvore, did. And all we did is have software code and other functionality that allows our users to upload lawful images. The fact that some choose to break the law and upload copyrighted images is not our responsibility causally under the law. And that's where the case law says if you impose liability on the Googles and the Facebooks and the other companies that take uploaded images, you will upend the Internet system which gives ISPs immunity under the law unless they are a direct participant in the theft. And here we are not. We are a host, a passive host of a thief's decision to put their material on our website. The argument about the metadata about the same here? I mean, the metadata, I couldn't quite follow the argument. There is no independent. I thought the metadata was a defense to the safe harbor. Yes. The metadata could be a defense. Whether it was a standard industry practice. Right. That's a DMCA issue that I don't think this court even needs to. Well, you're saying we don't get there because we don't have to get to secondary because they waived it. I would say that, but on the merits, they don't make out a case of secondary liability either, not even close call, because when there's substantial non-infringing uses and it's undisputed and conceded that Polyvore has manifold non-infringing uses, you have to prove that the defendant, through its affirmative acts or through its statements, encourages, induces. Induces or controls it. Well, the control goes to vicarious liability. But on the contributory or secondary liability, there is no record evidence, zero, and Judge Abrams below found correctly, no evidence that Polyvore in any way encourages, induces a copyright infringement. To the contrary, the only record evidence is that. Make it available. No. We make available a clipper tool for people to engage in lawful conduct. Just the way Facebook or Google or any other company permits uploading of photographs and the terms of service say you cannot break the law. You cannot upload infringing material. That's all. But we do not, unlike the cases like Grokster and the others, where the entire business model of the company was to, and the principal object was infringement here. In fact, the only record evidence about Polyvore's attitude toward encouragement of infringement is to the contrary. The only record evidence, which is at Joint Appendix 100 and 105 to 106, is that we went to great lengths to discourage infringement. You discourage it by an announcement at the beginning, and then you have a procedure to remove it. Correct. Within a day, if it's noticed to you. We outlaw it, and then when it's pursuant to the scheme that Congress set up, when we're aware of it, we root it out. In contradistinction to Grokster, where the very business model had as its principal object infringement. Polyvore is- Can we come back to the multiple copies, whether 9, 5, or 15? They're multiple. You analogize what you do to a user just sending one photo up to Facebook or YouTube. And you say you're no different than that. Is that your theory? I could say a copy machine, too. If I have a copy machine, and you can make one copy, and it can be your homework, or you can make one copy of a copyrighted book. In a copy store you're talking about? Yeah, if I'm the copy machine. But if I walk into a copy store, and I want nine copies to give to my friends, I tell the machine nine copies. And I'd probably pay for each one, right? That's not what happens with you. But the machine maker is not liable in any event. That's the point. The point is- Let's get to the machine maker. Your copy store analogy is a user going in and saying the user wants nine copies. It wouldn't matter- Is that what happens in a copy store? Yes. Okay. In your store, or with your piece of equipment, he tells us the user doesn't even know nine copies are being made. Is that right? There's no record evidence of what a user knows or doesn't know. And, again, I'm not being coy, but it's the plaintiff's burden here, and they did not develop any record of any of these facts. Did they allege it? No. They didn't even allege it in their complaint? No. Mr. Sanders put in an affidavit saying that he did his research and discerned that nine copies were made. But let me make this- Not in the plaintiff's response to undisputed facts? I don't believe so, but we'll check. Your Honor, let me just say this. The nine copies are copies of the self-same photo. It's not as if we are- This would be infringement. A user uploads a photo. We then make one copy of it, and then we search the Internet for eight similar photos and put those online. That's an infringement. But making nine copies of the same photo to accommodate a user's ability to deploy that photo in the- I take a photo of a copyrighted magazine article that's there, and I then go and I make nine copies I haven't infringed? No. What I'm saying, Your Honor, is that you've infringed because you've taken the photo, but the machine maker doesn't take the photo. The machine maker is responding to the command. The inquiry under the case law, Your Honor- We agree if I go in and do it with my own smartphone, I've infringed. If you upload nine images or take nine- Just taking the picture nine times, I'm making nine copies. The user who uploads nine copyrighted photos without authorization is liable. Now, he's saying that your customer sends one photo to you, selects one photo, and your machine makes nine copies. It's the same photo. There's no direct liability, Your Honor. But the copyright law protects against copying. Yes, Your Honor. It doesn't say copying nine times. No. With all due respect, what Your Honor is missing is the case law. Every circuit looks at the automated process and says, who is the author of the infringement in the first instance? And it's a causal connection. There's a lot of language floating. No, Your Honor. I think, with all respect, you're eliding over the key doctrinal reason, the policy reason for this important rule that Judge Walker- When I asked you, does it matter what kind of machine? And you said, oh, yes, it does. We're not saying all machines. No. You said, is it every machine is innocent? And I said, no, it depends what the machine does. Right. And if the machine searches out copyrighted material and procures it and puts it on the Internet, then the machine maker is liable. That's Grokster. But that's the easy case. This is an easy case. This case is no different, Your Honor, none, than any other case, including the Ninth Circuit's Perfect 10, the Fifth Circuit's TS software, which post-State Aereo, where an automated process simply responds to a user command. The case law says it doesn't matter how many copies are made of the same image. It's the decision of the user to- And what type of equipment was that set about? The one you just read us. Was that Grokster? No, I'm reading my own notes, Your Honor. Oh, your own notes. Oh. But Grokster, but all the case law talks about in BWP, in Perfect 10, the Ninth Circuit said it's technology. It's just a reader, a piece of software, a passive host. The user is the one who uploads. What type of equipment were they talking about? Exactly the same as us, a user-driven platform. Users upload content on the defendant's server. Then it goes on to online bull- The one they're talking about make multiple copies? No. Well, then it's not exactly like yours. I would say, Your Honor, the question is not how many copies are made. Well, I know you say that. But if you look at the doctrine and the reason for the rule, it makes no sense to have it turn on whether one or four or nine copies are made. The Copyright Act protects against copying, so maybe it does matter. It protects, it prescribes direct infringement and secondary contributory infringement. Your Honor, if I ask, I'll try and download a copy of something on my iPhone, and instead of providing the picture, the program of the iPhone provides nine pictures with different tints in it. Are you saying that that's basically the same picture? Different tints? Yeah, because that's- I mean, I haven't considered that, whether they'd have a fair use defense as transformative. I don't know. I don't know. But the case here is if we were doing anything to participate in the decision to take the copyrighted material and put it on our website, we would have a problem. What we do is passive, and it is exactly the same. You're in a very good rhetorical position, and I compliment you on it, but you're taking the one thing, the first step you do, for which there's no question you're not liable, and you keep reminding us of the step for which you're not liable. But we're, at least I've been trying to ask you about the subsequent steps for which you might be liable. And I'll address that. On the subsequent steps, it's no different than the so-called first step, and I would submit it's the same step, meaning whether we make one or nine, we are not the author of the original choice to infringe. And the case law looks at our conduct and did us, did we, the machine maker, do anything, provide the user with access to? This is what the case law looks at. Did we do anything to either procure ourselves the infringing content? No. Did we give them the means to, the access to find and select the infringing material and put it on our server? The answer to that is no. That ends the inquiry, and it doesn't matter. Right. And the reason a holding that made a distinction between one or nine would be, and I'm not being hyperbolic or hysterical, dangerous, is because the order that exists today on the Internet, the balance between free expression on the one hand and protecting the rights of the other, commands the machine makers to do nothing other than host, and the case law says when you do nothing other in response to a command to make a copy, which we make multiple copies of the same image, it's not as if we're then taking that image and violating copyrights. So whether we do one or nine, if the one isn't an infringement, which it's not, because there's no causal link between the theft and anything we've done, we're just passively receiving the stolen goods, then it makes no sense, commonsensically or in terms of the policy that we're trying to promote by limiting direct liability only to volitional actors, to say that if we duplicate that image, which we're not liable, so that a user can have different functionality in cutting and pasting the wedding dress on different devices, it would defeat the whole purpose of the volitional conduct rule. It looks not at how many copies of the stolen goods did we make, but did we steal the goods, and we didn't. Are you suggesting that the user is the thief? Of course. The user is in violation of the terms of policy. The user has taken copyrighted material and uploaded it no different than... You're aiding and abetting. No, no. We would be either a contributory infringer or a vicarious infringer, and under the case law, the judge below was clearly correct in finding that we were neither. As to secondary liability, there's substantial non-infringing uses. In fact, our entire website is designed to e-commerce. There's just one little clipper tool in the left hand. We're not like Rockster, which are in the business to infringe. If you go on our website, it's where people go to shop. Even if that was disputable as to secondary liability, you have a safe harbor. We do have a safe harbor, but you don't even need to get there, because there is zero evidence that anything we said or did... I'm more interested, frankly, to go back to the nine pictures. What we have here, you're arguing, is an absence of volitional conduct on your part, because all of this is engineered by the user. If you go back to the original doctrine, the whole concept of volition and non-volition really wasn't in the original law. That's judge-made law, because there came a question when these devices were being used, is who was actually doing the copying. Here, your point is that the user is the one who's doing the copying. There's no volitional conduct on the part of your client. The fact that the user is doing the copying, and that your client is making available, in a non-infringing context, various copies that can be used by the user in the iPad, the iPhone, the computer, whatever, doesn't change anything. It doesn't change anything. In fact, yes, and what it doesn't change fundamentally is the user posted the infringing material on our site, a site that is not designed for infringement, that's not in business to infringe. In response, we made copies of that. That's what we do. If you took a picture of your wedding dress and uploaded it onto our Clipper tool, we would give you enough images to do what you want to do with them. That's not an infringement. The infringement isn't in the copying. The infringement is in the uploading. The second act is simply responding to a user's command in a way that is user-friendly, and it would defeat the very... If the Second Circuit announced a rule, contrary to the Fifth Circuit and the Ninth Circuit, and I think contrary to the Supreme Court authority as well, that if you make one copy of a pirated photo as a machine maker, you're in the clear, but if you make five or nine of the same image in response to a user's infringing upload, you're now liable. It's a rule that doesn't comport with the rationale. You said you make nine copies. You said in response to his upload. Okay. But he didn't ask for the nine copies. But it's not an infringement as a matter of law under the Volitional Conduct Test. You may be right, but to talk about copies in response to his is really stretching. Fair enough. But I would say this, Your Honor. I would say that it is a critical error in terms of the Volitional Conduct Test, in terms of its animating principles, and Justice Scalia does a great job of describing the test, and he cites cases going back to the mid-'60s that apply this test, and not a name. The name was adopted in cases, and this was the first circuit, I think, to call it the Volitional Conduct Test in the Cablevision case. The rule that you're suggesting . . . There was an Eastern District case. Fourth Circuit was first. Second Circuit was second. And Justice Scalia does a nice job of harmonizing all those decisions, including the lengthy footnote where he goes back to the mid-'60s, and every case that is found, including Supreme Court cases, direct liability, looks to the actor, whether it's a machine maker or an ordinary run-of-the-mill defendant, and says, did they, through their affirmative conduct, procure the stolen goods? Did they seize the chattel that is subject to copyright? And we did not. We were the passive recipient of it, and if you say that one copy is okay, but two or nine is not, it's not consonant with the animating policy reason for the rule, which is to allow Internet providers to operate freely and assume that their users are going to be law-abiding citizens and follow the terms of service. But if you, as a machine maker, cross any line and start fetching or procuring stolen goods and putting it on your platform, that you've crossed the line. The undisputed record is that we have not, which is why the Fifth Circuit rejected the argument here. And I understand they didn't reject a multiple copy argument, but to hold multiple copies is principally different than one copy is inconsistent with the volitional conduct rule and its animating principles. And I think that if you look, for example... We have your argument, and this has gone on way long, so I want to use my prerogative as presider to ask you one last question. Yes, Your Honor. On your cross appeal, do you concede that the standard for judging the cross appeal is abuse of discretion? In terms of the attorney's fees? Yes. Yes, for sure. All right, that's all I have. Thank you. This is a good moment to... There's no claim here for attorney's fees in connection with this appeal, is there? No, Your Honor. We'll reserve decision. Thank you all. I thought he reserved. He didn't reserve? What? He didn't reserve a minute? He didn't ask for any rebuttal.  Thank you all. I'll ask the clerk to adjourn court. Okay.